UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NATIONAL PRODUCTS, INC., | CONSOLIDATED CASE |
| Plaintiff, | LEAD CASE NO. C15-1984JLR |
| v. | CLAIM CONSTRUCTION ORDER |
| ARKON RESOURCES, INC., | |
| Defendant. | |
| NATIONAL PRODUCTS, INC., | CASE NO. C15-1985JLR |
| Plaintiff, | |
| v. | |
| HIGH GEAR SPECIALTIES, INC., | |
| Defendant. | |

| | |
|---|---|
| NATIONAL PRODUCTS, INC., | CASE NO. C15-2024JLR |
| Plaintiff, | |
| v. | |
| WIRELESS ACCESSORY SOLUTIONS, LLC, d/b/a IBOLT – WIRELESS ACCESSORY SOLUTIONS, LLC, | |
| Defendant. | |
| NATIONAL PRODUCTS, INC., | CASE NO. C16-0109JLR |
| Plaintiff, | |
| v. | |
| BRACKETRON, INC., | |
| Defendant. | |

## I.  INTRODUCTION

This matter comes before the court in order to construe terms in United States Patent No. 6,585,212 (the "Patent"), entitled "Quick Release Electronics Platform." (*See* Am. Compl. against Arkon (Dkt. # 44) ¶ 10; *see also* Ex. A ("Patent").)  The court has reviewed the parties' claim construction briefs (NPI Op. Br. (Dkt. # 86); Defs. Op. Br. (Dkt. # 85); NPI Resp. (Dkt. # 92); Defs. Resp. (Dkt. # 94)), all materials filed in support thereof, the relevant portions of the record, and the relevant case law.  The court also heard oral argument from the parties at a *Markman* hearing on September 19, 2017. (9/19/17 Min. Entry (Dkt. # 95).)  Being fully advised, the court construes the disputed terms as set forth below.

## II.   BACKGROUND

Plaintiff National Products, Inc. ("NPI") owns the Patent and alleges that Defendants Arkon Resources, Inc. ("Arkon"), Bracketron, Inc. ("Bracketron"), High Gear Specialties Inc. ("HGS"), and Wireless Accessory Solutions, LLC d/b/a iBolt ("iBolt") (collectively, "Defendants") infringe claim 27 of the Patent through their respective accessory device holder products. (*See* Am. Compl. ag. Arkon ¶ 14; Am. Compl. ag. Bracketron (Dkt. # 45) ¶ 14; Am. Compl. ag. HGS (Dkt. # 46) ¶ 14; Am. Compl. ag. iBolt (Dkt. # 47) ¶ 21.) NPI further asserts that Bracketron additionally infringes claims 21 and 23 of the Patent. (Am. Compl. ag. Bracketron ¶ 14.) The parties stipulated to consolidate the four cases (Stip. Mot. to Consolidate (Dkt. # 18)), and the court adopted their joint memorandum (4/7/16 Min. Entry (Dkt. # 24)).

The Patent covers a mounting platform for holding a portable accessory device, such as a laptop or cell phone, in an automobile or other moving environment (the "Invention"). The Invention contains the following major structural components: (1) the platform, where the accessory device sits, which comprises of two large frame members or body portions that are pulled towards each other through a biasing member, such as a tension spring; and (2) several smaller arm tools that attach to both sides of the frame members and jut up above the top of the platform, so that these arms can grip the upper edge of the accessory device and secure the device against the platform. (*See* Patent at 1:47-2:3.) These two structural components feature repeatedly in the disputed terms.

//

//

The parties dispute the meaning of the following eight claim terms in the Patent:[1]

1. slidably interconnected;

2. mechanically coupled;

3. base portion (of the clamping mechanism)[2];

4. base portion (of the clamping member);

5. jaw portion;

6. jaw portion extending at an obtuse angle from one end of the base portion AND[3] jaw portion extending at a predetermined obtuse angle from one end of the elongated base portion;

//

//

---

[1] The parties initially presented 11 disputed terms to the court. (*See* Jt. Claim Chart (Dkt. # 81).) They have since agreed on the following constructions: (1) "one of the first and second frame members including a device mounting surface positioned relative to the first direction and a clamp mounting surface formed relative to the device mounting surface" means "at least one of the first and the second frame members must include both a device mounting surface and a clamp mounting surface"; (2) a "frame member" is a "body portion"; and (3) a "mounting structure for mounting on an external member" is a "structure for mounting the base portion of the clamping mechanism on an external member." (*See* 2d Revised Jt. Claim Constr. Chart (Dkt. # 91).)

[2] The court uses parentheticals to indicate the context of the disputed term that features prominently in the analysis. For example, although the disputed term is "base portion," the analysis of this term focuses heavily on the fact that it is the base portion of a clamping mechanism. *See infra* § III.B.3-4.

[3] The court uses conjunctions in all caps to indicate where the parties have submitted multiple distinct phrases or words as a single term requiring construction. These conjunctions are not part of the claim terms at issue; they merely separate the phrases or words that the parties have submitted for construction.

7.  jaw portion extending from the base portion at an angle between approximately 120 degrees and 150 degrees AND jaw portion . . . extending at an angle between approximately 120 degrees and 150 degrees; and

8.  clamp mounting surface being structured to cooperate with the mounting structure of the clamping mechanism for positioning the resilient compressible pad spaced away from and inclined toward the device mounting surface.

The court now discusses the law behind claim construction and the application of that law to these eight terms.

## III.   DISCUSSION

### A.   Law of Claim Construction

The court has the sole responsibility for construing patent claims. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Subsequent authority has clarified that the court construes claims as a matter of law, though the court may make subsidiary factual findings regarding extrinsic evidence. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, --- U.S. ---, 135 S. Ct. 831, 836-38, 840-42 (2015). In practice, executing the *Markman* mandate means following rules that rank the importance of various sources of evidence that disclose the "true" meaning of claim terms.

The Federal Circuit summarized its view of proper claim construction in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Although the case focused on the role of dictionaries in claim construction, it also reviewed the claim construction process. Intrinsic evidence, which includes the patent and its prosecution

//

history, is the primary source from which to derive a claim's meaning.[4] *Id.* at 1314. The court's task is to determine the "ordinary and customary meaning" of the terms of a claim in the eyes of a person of ordinary skill in the art on the filing date of the patent. *Id.* at 1313 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In its review of intrinsic evidence, the court should begin with the language of both the asserted claim and other claims in the patent. *Id.* at 1314; *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[C]laim construction analysis must begin and remain centered on the claim language itself.").

The court must read claim language, however, in light of the remainder of the patent's specification. *Phillips*, 415 F.3d at 1316 ("[T]he specification necessarily informs the proper construction of the claims."). The specification acts as a "concordance" for claim terms, and is thus the best source beyond the claim language for understanding those terms. *Id.* at 1315. The inventor is free to use the specification to define claim terms as she wishes, and the court must defer to the inventor's definitions.

---

[4] A patent is composed of three parts: (1) a "written description," which consists of an often lengthy exposition of the background of the invention, at least one embodiment of the invention, and other written material that assists in understanding how to practice the invention; (2) in most cases, a set of drawings that illustrates portions of the written description; and (3) the claims, which delimit the scope of the invention. *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992). Together, these three components make up the patent's "specification." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1384 (Fed. Cir. 1999); 35 U.S.C. § 112. However, although 35 U.S.C. § 112 includes the claims as part of the specification, many courts and practitioners use the term "specification" to refer to all portions of a patent except the claims. In most instances, the context will reveal what portion of the specification is at issue.

1  *Id.* at 1316 ("[T]he inventor's lexicography governs."). The court should "rely heavily"

2  on the specification in interpreting claim terms. *Id.* at 1317. The court should not,

3  however, commit the "cardinal sin" of claim construction—impermissibly reading

4  limitations from the specification into the claims. *Id.* at 1320 (citing *SciMed Life Sys. v.*

5  *Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Although a

6  court should limit the meaning of a claim where the "specification makes clear at various

7  points that the claimed invention is narrower than the claim language might imply," the

8  court must not read particular embodiments and examples appearing in the specification

9  into the claims unless the specification requires it. *Alloc, Inc. v. Int'l Trade Comm'n*, 342

10  F.3d 1361, 1370 (Fed. Cir. 2003); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d

11  1560, 1571 (Fed. Cir. 1988). Additionally, although figures illustrating the invention

12  may be used in construing claims, "the mere fact that the patent drawings depict a

13  particular embodiment of the patent does not operate to limit the claims to that specific

14  configuration." *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir.

15  2003).

16     More recently, the Federal Circuit has continued to emphasize the importance of

17  reading the claims in the context of the specification and prosecution history.[5] *Laryngeal*

18  *Mask Co. Ltd. v. Ambu*, 618 F.3d 1367, 1370 (Fed. Cir. 2010) ("The words of a claim are

19

20  ─────────────────────────

21     [5] The prosecution history exists independently of the patent. It consists of the inventor's application to the United States Patent and Trademark Office ("PTO") and all correspondence between the PTO and the inventor documenting the invention's progress from patent application

22  to issued patent. *Vitronics*, 90 F.3d at 1582.

generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention when read in the context of the specification and prosecution history."). Although the patent's prosecution history is also intrinsic evidence, it is generally "less useful for claim construction purposes" than the specification. *Phillips*, 415 F.3d at 1317. Because the prosecution history documents an invention's evolution from application to the issuance of the patent, it usually "lacks the clarity of the specification." *Id.* The prosecution history is useful, however, in determining when an inventor has expressly disavowed certain interpretations of her claim language. *Id.* Specifically, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution. *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008). A patentee could do so, for example, by clearly characterizing the invention in a way to try to distinguish prior art. *Id.* The doctrine of prosecution disclaimer "protects the public's reliance on definitive statements made during prosecution" by "precluding patentees from recapturing through claim interpretation specific meanings [clearly and unmistakably] disclaimed during prosecution." *Id.* (internal quotation marks omitted).

Finally, the court can consider extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980) (internal quotation marks omitted). For a variety of reasons, extrinsic evidence is usually "less reliable than the patent and its prosecution history" as a source for claim interpretation. *Id.* at 1318. The court thus need not admit extrinsic evidence, but may do so at its discretion. *Id.* at 1319.

1    With this general framework in mind, the court turns to the disputed claim terms.

2    **B.    Disputed Terms**

3         The parties ask the court to construe the following eight terms.  The court

4    addresses each term in the order the parties briefed them and groups together terms when

5    appropriate.

6         1.   slidably interconnected

7         The term "slidably interconnected" appears in Claims 1, 21, 27, and 33 of the

8    Patent.  (Patent at 7:21-32, 9:40, 10:16-17, 10:54-55.)  It describes how the two frame

9    members of the Invention are structured in relation to each other.  (*See id.*)  The parties

10   agree that the term must allow the two frame members to slide relative to one another

11   along one direction but disagree as to whether the two frame members must be directly

12   connected.  (NPI Op. Br. at 7; Defs. Op. Br. at 6-7.)  The parties offer the following

13   competing constructions:

14        **NPI's Proposed Construction:** "structured to permit sliding relative to one

15        another along one axis."  (NPI Op. Br. at 6.)

16        **Defendants' Proposed Construction:** "connected to each other to permit sliding

17        relative to one another along one axis."[6]  (Defs. Op. Br. at 6.)

18   //

19   _____

20        [6] Defendants' lack of a modifier before the term "connected" suggests that its
     construction encompasses both direct and indirect connections.  *See Douglas Dynamics, LLC v.*
21   *Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) (noting that the ordinary meaning of
     "connected to" encompasses indirect linkages).  However, because Defendants repeatedly
22   dispute the inclusion of indirect connections, the court reads their proposed construction limiting
     the term to direct connections.

1    The court construes this term as "connected, directly or indirectly, to each other to

2 permit sliding relative to one another along one axis." This construction largely tracks

3 Defendants' proposal but emphasizes that the connection may be either direct or

4 indirect.[7]

5    Defendants maintain that the two frame members must be directly connected

6 because the descriptions and the embodiments in the specification exclusively describe a

7 track-and-slide system that directly connects the two frame members. (Defs. Op. Br. at

8 6-7.) But this is an improper attempt to import the limitations in the specification to the

9 claim language. *See SciMed Life Sys.*, 242 F.3d at 1341. There are no "repeated and

10 definitive remarks" in the specification that the embodiments described are the only ones

11 contemplated, *see Comput. Docking Station Corp.*, 519 F.3d at 1374; in fact, the

12 specification contains a statement to the contrary, noting that "[w]hile the preferred

13 embodiment of the invention has been illustrated and described, it will be appreciated that

14 various changes can be made therein without departing from the spirit and scope of the

15 invention" (Patent at 7:25-28). Because the intrinsic evidence does not demonstrate "a

16 clear intention to limit the claim scope" in the fashion Defendants propose, the court

17 declines to do so. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir.

18 2004).

19 //

20

21

22    [7] NPI notes in its briefing and again at oral argument that it had proposed this
construction in an attempt to reach agreement on this term. (NPI Op. Br. at 7-8 n.3.)

ORDER- 10

1    This conclusion—that not every iteration contemplated by the Patent contains the

2    track-and-slide system—is bolstered by the fact that Claim 6, a dependent claim,

3    specifies that the two frame members include "cooperating track-and-slide members."

4    (*See* Patent at 7:65-66.) Because this dependent claim contains the track-and-slide

5    system, it implies that the independent claim upon which it depends—Claim 1 with the

6    "slidably interconnected" language—does not limit the Invention to track-and-slide

7    systems. *See Phillips*, 415 F.3d at 1315 (finding that the presence of a dependent claim

8    that adds a particular limitation gives rise to the presumption that the limitation is not

9    present in the independent claim).

10       Moreover, limiting "slidably interconnected" to a direct connection excludes an

11   embodiment disclosed by the specification. An interpretation that makes a preferred

12   embodiment fall outside the scope of the patent claim is "rarely, if ever, correct."

13   *Vitronics Corp.*, 90 F.3d at 1583. But Defendants' construction would do just that. For

14   instance, Figure 2 of the Patent evinces the two frame members in an indirect connection:

15   The body portions are not directly touching each other, but instead, are connected

16   through an intermediary structure—in this embodiment, a tension spring.[8] (*See* Patent at

17   Fig. 2.) Furthermore, in the description of the preferred embodiment, the specification

18   states that "the first and second body portions 12, 20 can be separated by a force exerted

19

20       [8] At the *Markman* hearing, Defendants recognized that the frame members in Figure 2 are
21   not connected other than through the tension spring. They argued, however, that Figure 2 does
     not depict a "functioning" device, and that "once [the device] is functioning," the frame members
22   would be directly connected. But as Defendants conceded, language regarding whether the
     device is functioning is not in the Patent. Consequently, the court rejects this argument.

along the first direction 16." (*Id.* at 4:50-51.) But an intermediary component, such as a tension spring, would "resist the separating force . . . and thereby urge[] the first and second body portions 12, 20 back together." (*Id.* at 5:52-54.) Thus, both the figure and the description illustrate the possibility of an indirect connection between the two frame members.

The conclusion that "slidably interconnected" would encompass both direct and indirect connections is further supported by *Douglas Dynamics, LLC v. Buyers Products Company*, 717 F.3d 1336 (Fed. Cir. 2013).[9] *Douglas Dynamics* considered a similar dispute over whether the term "connected to" encompassed only direct connections between the two parts in question. *Id.* at 1342. The patent contained an embodiment that depicted the two parts connected via an intermediate "hitch arm" that is separate from both pieces but "serves to indirectly connect the two [parts] together." *Id.* at 1342-43. Because a construction that required direct connections would "exclude a preferred embodiment of the invention," *id.* at 1342, the court concluded that the term "connected to" is not limited to direct connections, *id.* at 1343. Similarly here, the Patent features an embodiment that depicts the two frame members connected via a tension spring that is separate from both body portions but indirectly connects the two. (Patent at Fig. 2.) Because construing the term to encompass only direct connections would exclude this

//

_____

[9] The court uses this precedent "not as controlling authority for its decision" but "merely [to] further confirm the correctness of its independent claim construction." *See V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005).

1   preferred embodiment, the term "slidably interconnected" likewise cannot be limited to

2   direct connections.

3       Defendants correctly observe that the term "interconnect" is used in Claim 16 to

4   describe a direct connection. (Defs. Op. Br. at 7.) And it is generally correct that terms

5   are "normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314.

6   However, although the connection in Claim 16 happens to be a direct one, nothing about

7   the usage of the term "interconnect" in that claim limits all connections to direct

8   connections. (*See* Patent at 8:65-66.) Thus, there is no inconsistency for the term

9   "interconnect" to include both direct connections, as described in Claim 16, and indirect

10  connections, as is the case for the two frame members.

11      Finally, Defendants contend that the dictionary definition of "interconnect"

12  supports their proposed construction. (Defs. Op. Br. at 7.) The Webster's II New

13  College Dictionary, which Defendants rely on, defines "interconnect" as "[t]o be

14  connected one to the other." (*Id.*) But critically, this definition does not mandate that the

15  connection be direct. Indeed, even an indirect connection, such as the one depicted in

16  Figure 2, would fall within the Defendants' own definition for "interconnect." Thus, the

17  dictionary definition supports the court's construction.

18      The foregoing analysis leads the court to conclude, as NPI argues, that "slidably

19  interconnected" encompasses both direct and indirect connections. But NPI's proposed

20  construction is nonetheless flawed. NPI's proposal—"structured to permit sliding

21  relative to one another"—could encompass devices that are not connected at all, but

22  rather structured in a way that allows the two parts to move alongside each other. Such a

reading would contradict the term's ordinary and customary meaning as understood by a person of ordinary skill in the art. And nothing in the intrinsic evidence suggests that "slidably interconnected" can be construed to include devices whose frame portions are not connected whatsoever. (*See generally* Patent.)

Accordingly, the court adopts Defendants' construction but clarifies that the connection may be direct or indirect. The court construes "slidably interconnected" to mean "connected, directly or indirectly, to each other to permit sliding relative to one another along one axis."

### 2. mechanically coupled

The term "mechanically coupled" appears in Claims 14, 21, and 27 of the Patent. (Patent at 8:37-38; 9:50; 10:27.) The parties dispute whether the term warrants construction.

**NPI's Proposed Construction:** No construction is necessary. (NPI Op. Br. at 8.)

**Defendants' Proposed Construction:** "directly mechanically connected." (Defs. Op. Br. at 7.)

Again, the parties' dispute boils down to whether the term "mechanically coupled" denotes direct connections only. Defendants rest upon much of the same reasoning they proffered in the construction of the term "slidably interconnected." As was the case above, the court finds Defendants' arguments unpersuasive and accordingly declines to construe this term.

The court is not to make a construction that "contribute[s] nothing but meaningless verbiage to the definition of the claimed invention." *Harris Corp. v. IXYS Corp.*, 114

F.3d 1149, 1152 (Fed. Cir. 1997). Claim construction is required only "when the meaning or scope of technical terms and words of art is unclear . . . and requires resolution to determine" the issue. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The term "mechanically coupled" should be readily understandable by the jury, and there is no indication that the term requires any clarification or resolution.

Moreover, the term should not be limited, as Defendants argue, to direct connections only. At the outset, it is unclear whether Defendants recognize that the term "mechanically coupled" describes the connection between the biasing member and the frame members, and not the connection between the two frame members. For instance, Defendants repeatedly argue that "mechanically coupled" is used "in a manner that indicates that the first and second frame members must be directly connected to each other." (Defs. Op. Br. at 7.) In its response, Defendants again criticize NPI for arguing that "the connection between the first and second frame members need not be direct." (Defs. Resp. at 4.) Even at the *Markman* hearing, Defendants continue to focus on how the resilient biasing member must directly connect the two frame members.

But the Patent indisputably uses "mechanically coupled" to describe how the biasing member is connected to the frame members. (*See* Patent at 8:37-38 ("[A] resilient biasing mechanism that is mechanically coupled between the first and second body portions[.]").) To the extent that Defendants are arguing the term "mechanically coupled" should be construed as the two frame members being directly connected, the court has already considered and rejected this construction. *See supra* § III.B.1.

1  However, giving Defendants the benefit of the doubt, the court will proceed to analyze

2  their proposed construction as purporting a direct connection between the biasing

3  member and the body portions.

4          Defendants again rely on the embodiments in the specification to assert that

5  "mechanically coupled" must be limited to direct connections. (Defs. Op. Br. at 8.) But

6  as discussed above, the court cannot read particular embodiments and examples

7  appearing in the specification into the claims unless there is language in the specification

8  that "makes clear . . . that the claimed invention is narrower than the claim language

9  might imply." *See Alloc*, 342 F.3d at 1370. Defendants do not point to such language,

10 and the court is unable to locate any. (*See generally* Defs. Op. Br.; Defs. Resp.; Patent.)

11 Thus, construing this term to require a direct connection would contravene the Federal

12 Circuit's mandate that courts avoid limiting claim language based on preferred

13 embodiments that are only intended to be illustrative. *See Alloc*, 342 F.3d at 1370.

14         Defendants' reliance on *Asetek Holdings, Inc. v. CoolIT Systems, Inc.*, C-12-4498

15 EMC, 2013 WL 6327691, at *6 (N.D. Cal. Dec. 3, 2013), is likewise misplaced. (*See*

16 Defs. Resp. at 4.) In that case, the court constructed the term "fluidly coupled" and

17 specifically considered whether "coupled" should be construed to require a direct

18 connection. *Id.* at *5. Defendants claim that *Asetek Holdings* "construed the term in light

19 of the specification," and thus counsels the court to do the same here. (Defs. Resp. at 4.)

20 But that is not what the *Asetek Holdings* court did. In fact, to the contrary, the court

21 made clear that "the fact that the specifications of the patents show only direct

22 connections is not dispositive." *Asetek Holdings*, 2013 WL 6327691, at *5. Instead, the

court homed in on the fact that the claims themselves specified the means of connection; in such a situation, "where a means of coupling is specified, that is the exclusive means of connection."[10] *Id.* at *6. The situation identified in *Asetek Holdings* is not present here, as the Patent at issue does not specify a means of coupling in the claim language. And in accordance with *Asetek Holdings*, the direct connections described in the specification are not dispositive. *See id.* at *5. Thus, Defendants cannot rest on *Asetek Holdings* to import limitations from the specification.

The court agrees with NPI that the term "mechanically coupled" is readily understandable and carries no special meaning within the Patent. Accordingly, the court declines to construe the term "mechanically coupled."

3-4. base portion (of the clamping mechanism) AND base portion (of the clamping member)[11]

The term "base portion" appears throughout the Patent in reference to either a "clamping mechanism" or a "clamping member." (*See, e.g.*, Patent at 7:35-38; 9:33-34; 9:56-57.) The parties offer the following competing constructions of the respective terms:

---

[10] Even so, the *Asetek Holdings* court declined to construe the term "fluidly coupled" to mean "directly fluidly connected" because it concluded that "a construction incorporating terms such as 'direct' or 'indirect' would not be helpful to the jury." 2013 WL 6327691, at *7. Accordingly, the court simply construed "fluidly coupled" to mean "fluidly connected." *Id.*

[11] Like the parties, the court addresses disputed Terms 3 and 4 together, as both pertain to the interpretation of "base portion," with the operative dispute over whether "clamping mechanism" and "clamping member" refer to the same part of the Invention. (*See* NPI Op. Br. at 10; Defs. Op. Br. at 8.)

1 **Base portion (of the clamping mechanism)**

2 **NPI's Proposed Construction:** "bottom portion of the clamping mechanism."

3 (NPI Op. Br. at 10.)

4 **Defendants' Proposed Construction:** "bottom part of a clamping member or a

5 clamping mechanism having an axis and connected to the curve or bend of the jaw

6 portion." (Defs. Op. Br. at 8.)

7 **Base portion (of the clamping member)**

8 **NPI's Proposed Construction:** "bottom portion of the clamping member." (NPI

9 Op. Br. at 10.)

10 **Defendants' Proposed Construction:** "bottom part of a clamping member or a

11 clamping mechanism having an axis and connected to the curve or bend of the jaw

12 portion." (Defs. Op. Br. at 8.)

13 The parties agree that "base portion" means the "bottom part" of the referenced

14 object (NPI Op. Br. at 10, Defs. Op. Br. at 9), but they disagree as to what that referenced

15 object is. NPI accuses Defendants of conflating the terms "clamping mechanism" and

16 "clamping member" when the two terms instead refer to different components in the

17 Invention. (NPI Op. Br. at 13.) NPI contends that a "clamping member" is the arm tool

18 that holds the accessory device in place, whereas a "clamping mechanism" refers to the

19 entire larger mounting apparatus, which includes, in addition to the clamping members,

20 the frame members that the accessory device sits upon. (*See id.*) Defendants, on the

21 other hand, maintain that "clamping member" and "clamping mechanism" are used

22 //

interchangeably in the Patent to refer to the accessory-holding arm that is mounted to the side of the frame members. (Defs. Op. Br. at 9-10.)

The court agrees with Defendants and concludes that the terms "clamping mechanism" and "clamping member" both refer to the same component: the arm tool that is mounted to the side of the frame members and holds the accessory device in place. Thus, it adopts the first portion of Defendants' definition and construes "base portion" as the "bottom part of a clamping member or a clamping mechanism" for both disputed terms. However, the court does not adopt the remainder of Defendants' proposed construction.

To begin, the court recognizes the parties' agreement that a "clamping member" refers to the arm tool that attaches to the frame members and grips the inserted accessory device. (*Compare* NPI Op. Br. at 13, *with* Defs. Op. Br. at 10.) This construction of "clamping member" is consistent with the intrinsic materials. First, Claims 1, 16, and 33 make clear that clamping members are "coupled to each of the first and second frame members." (Patent at 7:35-36; 10:58-59; *see also id.* at 9:13-14 ("one or more of the clamp members mounted on each of the first and second body portions").) Second, the specification reveals the clamping members to be the arm tools in both its figures and its description. For instance, it repeatedly labels the part depicted in Figures 3A-E as a "clamp member" (*id.* at 2:19-37), and Figures 3A-E incontrovertibly show various embodiments of the arm tool (*id.* at Figs. A-E). The specification's detailed description of its preferred embodiment additionally notes that "at least one clamp member [] is mounted on each of the first and second body portions" (*id.* at 2:58-59) and that "the

inclined clamping surfaces [] of the clamp members [] engage opposing edges of an upper surface of the base portion of the accessory device" (*id.* at 3:4-6). Thus, it is without doubt that a "clamping member" refers to the arm of the Invention that is attached to the frame members and grips the accessory device.

The construction of "clamping mechanism" presents a closer question. But both the claim language and the specification make clear that a "clamping mechanism" is the same as a "clamping member."[12] The court addresses the claim language and the specification in turn.

First and foremost, the language and the context of the claims indicate that "clamping mechanism" refers to the arm tool and not to the entire mounting platform. "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms," and the "context in which a term is used" can be "highly instructive." *Phillips*, 415 F.3d at 1314. Here, Claim 21 lists the clamping mechanism not as the larger mounting device, but instead as a component of that mounting device. (*See* Patent at 9:32-33.) Moreover, the clamping mechanism is described as having only three subcomponents: (1) a base portion; (2) a jaw portion; and (3) a compressible pad fixed to

---

[12] This conclusion is not at odds with the parties' agreed-upon construction of "mounting structure for mounting on an external member" as a "structure for mounting the base portion of the clamping mechanism on an external member." (*See* 2d Revised Jt. Claim Constr. Chart at 16-17.) If the clamping mechanism is the arm tool, then the external member that the clamping mechanism is mounted to would be the frame member. Indeed, the specification describes just such a mounting structure on the base portion of the arm tool that interacts with a clamp mounting surface on the frame members. (*See, e.g.,* Patent at 5:41-52; 6:7-14.) Thus, the clamping mechanism can have a mounting structure that attaches to an external member without having to be construed as the larger mounting apparatus.

the surface of the jaw portion. (*Id.* at 9:33-39.) Claim 21 does not describe the clamping mechanism as including the frame members, which are undeniably a part of the larger mounting platform; instead, the frame members are listed as a completely separate component. (*Id.* at 9:40-49.) If a "clamping mechanism" were, as NPI contends, the larger mounting apparatus (*see* NPI Op. Br. at 13), then the organization of the components and subcomponents within Claim 21 would make little sense.

Similarly, construing the "clamping mechanism" as the larger mounting apparatus would belie the stated interaction between the clamping mechanism and the clamp mounting surface. Claim 21 describes the frame members as having a "clamp mounting surface" that "cooperate[s] with the mounting structure of the clamping mechanism." (Patent at 9:45-47.) Accepting NPI's contention that the mounting structure of the clamping mechanism is on the bottom of the frame members, it would be hard to imagine—indeed, nonsensical—for that structure to "cooperate" with the clamp mounting surface on the side of the frame members.[13] The mounting structure of the clamping mechanism is more likely the base portion of the arm tool, which is repeatedly described as having a high friction surface area configured to cooperate with the high friction surface area of the clamp mounting surfaces, so that the arm tool is securely fixed to the frame members. (*See, e.g.*, Patent at 5:40-48.) Claim 21's description of how the frame members interact with the clamping mechanisms is strong evidence that the

_____

[13] The court conducts a more detailed analysis of this "cooperation" in its consideration of Term 8, which also features the "cooperation" language. *See infra* § III.B.8.

clamping mechanisms, like the clamping members, are the arm tools that attach onto the frame members.

Claim 14 further confirms that a claim mechanism is the arm tool, and not the larger mounting apparatus. Generally, the use of a term in one claim "often illuminate[s] the meaning of [that] same term in other claims" because terms are "normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314. Claim 14 utilizes the term "clamping mechanism" in an almost identical fashion to how other claims utilize the term "clamping member." For instance, it clarifies that "the clamping mechanisms [are] coupled to each of the first and second body portions" so that the clamping mechanisms can "compress[] an external object between the jaw portion and the respective first and second device mounting surface." (Patent at 8:53-61.) This account of "clamping mechanism" supports the court's construction: Both terms are used to describe the arm tool that is mounted onto the frame members and grips the accessory device with its jaw portion. (*Compare* Patent at 7:35-36, 3:10-15, *with id.* at 8:53-61.)

NPI relies heavily on Claim 27 for its contention that a "clamping mechanism" is the larger mounting apparatus. And NPI is correct that Claim 27 describes the clamping mechanism as comprising of "a mounting platform" that includes the frame members and a structure for mounting on an external item. (Patent at 10:16-31; *see* NPI Op. Br. at 13.) But accepting NPI's assertion that the base portion of a clamping mechanism is "the bottom portion of a frame member" makes little sense (NPI Op. Br. at 15), even in the context of Claim 27. First, Claim 27 notes that the clamping mechanism has an "elongated jaw portion" that extends from "one end of the elongated base portion." (*Id.*

at 10:9-11.) Nowhere does the Patent describe the bottom of a frame member as "elongated," nor does the Patent ever state that a jaw portion would extend from the bottom of the frame members. Moreover, dependent Claim 28 notes that the clamping mechanisms would attach to clamp mounting surfaces located on the side of the frame members. (Patent at 10:32-36.) This attachment would be impossible under NPI's proposed construction: The larger mounting apparatus itself could not be attached to the frame members.

Apart from the claim language, the specification further confirms that a "clamping mechanism," like a "clamping member," refers to the arm tool. The "Summary of the Invention" states that the "clamping mechanisms [are] coupled to . . . the respective first and second frame members for compressing an external object onto the device mounting surfaces." (*Id.* at 1:51-54.) It details that the "clamping mechanism . . . securely, but gently, compresses an accessory device onto padded device mounting surfaces." (*Id.* at 1:40-42.) It later reiterates that the clamping mechanism "includes a substantially rigid, elongated base portion including structure for mounting on one of the first and second body portions." (*Id.* at 1:56-59.) This description of a clamping mechanism would be incongruous if the clamping mechanism were the larger mounting apparatus itself. Because the specification is often "highly relevant" and "the single best guide to the meaning of a disputed term," *see Vitronics Corps.*, 90 F.3d at 1582, its description here compels the court to conclude that the term "clamping mechanism," like a "clamping member," is the arm tool and not the larger mounting apparatus.

//

1    Although the court agrees with Defendants that "clamping mechanism" and

2    "clamping member" both refer to the arm tool of the Invention, it declines to adopt the

3    remainder of Defendants' proposed construction, which defines the base portion in terms

4    of how it connects to the jaw portion. (*See* Defs. Op. Br. at 8.) First, it is unnecessary to

5    define the base portion in relation to the jaw portion because simply defining the term as

6    the bottom part of the referenced object sufficiently identifies the component. To define

7    the base portion in this way would "contribute nothing but meaningless verbiage." *See*

8    *Harris Corp.*, 114 F.3d at 1152. Moreover, doing so improperly limits the claim

9    language to the embodiments, when nothing in the specification supports such a

10   limitation. *See Comput. Docking Station Corp.*, 519 F.3d at 1374. Thus, although

11   Defendants correctly observe that every embodiment of the Invention in the specification

12   contains an axis, and a bend or a curve between the base and jaw portions, the court will

13   not import that limitation into the construction of "base portion."

14       In sum, the court adopts only the beginning of Defendants' proposed construction,

15   and construes the base portion, as disputed in both Terms 3 and 4, to be "the bottom part

16   of a clamping member or a clamping mechanism."[14]

17   //

18   //

19

20   _____

21   [14] This construction of "base portion" applies only when the term is referencing a
clamping member or a clamping mechanism. It does not apply when the term "base portion" is
plainly referencing another object, such as when the specification talks of "accessory devices
22   having base portions of different thicknesses." (*See* Patent at 6:36-37.)

5. jaw portion

The term "jaw portion" appears in all of the independent claims, and some dependent claims, of the Patent.  (Patent at 7:41-44; 8:23-24; 8:47-60; 9:9-10; 9:36-39; 9:55; 10:10-14; 10:41; 10:67.)  The parties agree that the "jaw portion" is the part of the Invention that grips or holds onto the upper edges of the accessory device (NPI Op. Br. at 16; Defs. Op. Br. at 13), but they principally dispute whether the construction should include Defendants' proposed additional details regarding the jaw portion's connection to the base portion (NPI Op. Br. at 17; Defs. Op. Br. at 13).  The parties offer the following constructions:

> **NPI's Proposed Construction:** "portion of a [clamping member/clamping mechanism] that engages an accessory device."  (NPI Op. Br. at 16.)
>
> **Defendants' Proposed Construction:** "gripping part of a clamping member or a clamping mechanism including a straight portion having an axis and a portion with a curve or a bend connected between the straight portion and the base portion."  (Defs. Op. Br. at 12.)

The court rejects the additional limitations Defendants propose.  Instead, the court construes "jaw portion" as the "gripping part of a clamping member or a clamping mechanism that engages an accessory device."

The Patent language supports the court's construction.  The specification repeatedly describes the jaw portion as being positioned to "compress[] an external object" against the device mounting surface.  (Patent at 2:1-3.)  Because "clamping member" and "clamping mechanism" are used interchangeably, as discussed previously,

the construction of "jaw portion" utilizes both terms in its definition. *See supra* § III.B.3-4. Moreover, although Defendants maintain that not every part of the "jaw portion" engages the accessory device (Defs. Resp. at 8), they cannot deny that the "jaw portion" holds the accessory in place; in fact, their proposed construction recognizes this fact by including the adjective "gripping," which indicates the manner in which the jaw portion will interact with the accessory device (*see* Defs. Op. Br. at 13).

Defendants' proposal is again overly narrow because it limits components of a jaw portion to what is featured in the embodiments and figures in the specification. They are correct that the two figures that depict the jaw portion show either a curved neck portion (Patent at Fig. 3A) or a bent neck portion (*id.* at Fig. 3D). But the specification does not expressly limit the subject matter of the Patent to these two embodiments, nor does it clearly exclude other embodiments of the jaw portion. *See SciMed Life Sys.*, 242 F.3d at 1341. To the contrary, the specification emphasized that "various changes can be made" to the embodiments. (Patent at 7:25-28.) And while it is true that the prosecution history relied on the angle between the jaw and base portions to differentiate this Invention from prior art (Resp. to Official Action (Dkt. # 81-5) at 6), that prosecution history does not expressly limit how the jaw and base portions are connected—it simply mandates that the two are at an angle to each other. Thus, it is inappropriate for the court to limit the claim language to the described embodiments.[15]

_____

[15] Defendants' concern about how this construction would impact the measurement of the angle between the jaw and base portions is unfounded. (*See* Defs. Op. Br. at 12-13.) Such a concern is better addressed in the next section, which analyzes the two terms that directly

Accordingly, the court construes the "jaw portion" as a combination of the two parties' proposals: "gripping part of a clamping member or a clamping mechanism that engages an accessory device."

6-7. <u>jaw portion extending at a[n] [predetermined] obtuse angle from one end of the [elongated] base portion AND jaw portion extending [from the base portion] at an angle between approximately 120 degrees and 150 degrees</u>[16]

This term appears in Claims 1, 14, 16, 21, 27, 30, and 33 of the Patent. (Patent at 7:42-44; 8:47-50; 9:9-11; 9:35-36; 10:9-11; 10:41-43; 11:2-4.) The parties agree on the magnitude of the angle and the definition of "obtuse" (NPI Op. Br. at 18, Defs. Op. Br. at 14), but disagree on how to identify the two lines that make up the angle. The parties propose the following competing constructions:

**Jaw portion extending at a[n] [predetermined] obtuse angle from one end of the [elongated] base portion**

**NPI's Proposed Construction:** "jaw portion extending from the base portion at an angle greater than 90 degrees and less than 180 degrees formed by two lines, a first line defined by a surface on an interior portion of the jaw portion and a

//

---

implicate the construction of the angle. *See infra* § III.B.6-7. The court therefore finds it unnecessary to address how the angle is measured in this construction.

[16] As detailed at the beginning of the order, there are several variations of Terms 6 and 7, all of which are disputed. *See supra* § II. Neither party assigns any significance to these variations. Thus, the court addresses the terms together and utilizes brackets to signal the differences.

second line perpendicular to the device mounting surface." (NPI Op. Br. at 17-18.)

**Defendants' Proposed Construction:** "the jaw portion extends from the base portion at an angle, measuring greater than 90 degrees but less than 180 degrees, between the axis of the straight portion of the jaw portion and the intersecting axis of the base portion." (Defs. Op. Br. at 14.)

**Jaw portion extending [from the base portion] at an angle between approximately 120 degrees and 150 degrees**

**NPI's Proposed Construction:** "jaw portion extending from the base portion at an angle between approximately 120 and 150 degrees formed by two lines, a first line defined by a surface on an interior portion of the jaw portion and a second line perpendicular to the device mounting surface." (NPI Op. Br. at 18.)

**Defendants' Proposed Construction:** "the jaw portion extends from the base portion at an angle, measuring approximately 120 degrees to 150 degrees, between the axis of the straight portion of the jaw portion and the intersecting axis of the base portion." (Defs. Op. Br. at 16.)

The court finds it unnecessary to construe either term, other than defining the phrase "obtuse angle" in Term 6. Thus, the court construes Term 6 "jaw portion extending at a[n] [predetermined] obtuse angle from one end of the [elongated] base portion" to be "jaw portion extending at an angle greater than 90 degrees and less than 180 degrees from one end of the base portion." The court further declines to construe

//

1  Term 7, "jaw portion extending [from the base portion] at an angle between

2  approximately 120 degrees and 150 degrees."

3       The court largely declines to construe the two terms because the parties' attempt to

4  identify the two lines from which to measure the angle only muddles what is otherwise a

5  seemingly intuitive calculation.  The parties do not contend that there is a special

6  definition of "angle" or that the method to measure this angle is different from the

7  general understanding.  *See Ethicon*, 103 F.3d at 1568 (requiring construction only where

8  the "meaning or scope of technical terms and words of art is unclear").  Thus, aside from

9  the technical term "obtuse angle," the claim language is self-explanatory and needs no

10 further construction.

11      Indeed, neither party's proposed construction clarifies which two lines make up

12 the angle in question.  For instance, NPI proposes using "a first line defined by a surface

13 on an interior portion of the jaw portion and a second line perpendicular to the device

14 mounting surface."  (NPI. Op. Br. at 17-18.)  But NPI does not articulate what qualifies

15 as an "interior" portion of the jaw portion, nor does it specify which of the many interior

16 surfaces of the jaw portion the angle is to be measured from.  (*See* NPI Op. Br. at 17-20.)

17 Furthermore, NPI could not identify, and the court could not locate, any claim or

18 specification language defining the angle using the device mounting surface.[17]  (*See*

19

20      _____

21 [17] When asked to identify such language, NPI points to portions of the Patent that
   describe how "[t]he angle 74 positions the short straight portion 72 of the jaw portion 68 with the
   inclined clamping surface 28 facing inwardly and downwardly toward the respective first and
22 second device mounting surfaces."  (*See* Patent at 5:30-34.)  But this language does not utilize
   the device mounting surface as a reference point to measure the angle.  Instead, it details the

*generally* Patent.) Instead, the angle is repeatedly measured from "one end of the

elongated base portion" or linked "to the base portion." (*Id.* at 1:60-61; 5:22-23.) Thus,

to read out the base portion altogether when defining the angle, as NPI's proposed

construction does, is improper.

Nor does the Defendants' proposed construction provide any additional clarity.

Defendants would utilize "the axis of the straight portion of the jaw portion and the

intersecting axis of the base portion" as the two relevant lines. But Defendants include

undefined technical terms such as "axis" and "intersecting axis" that are not utilized in

any of the intrinsic materials. (*See generally* Patent.) Moreover, it assumes that there

would be a straight portion of the jaw portion from which to measure the angle from, and

that the base portion would have only one intersecting axis with the jaw portion. In doing

so, Defendants again improperly limit the claim language to the two embodiments shown

in the Patent figures. (*See* Patent at Figs. 3A, 3D); *SciMed Life Sys.*, 242 F.3d at 1341.

Because the court finds most of the language in Terms 6 and 7 to be readily

understandable and to carry no special meaning within the Patent, it largely declines to

construe the terms. However, it finds that "obtuse angle" is a technical term in need of

construction and thus adopts the parties' agreed-upon definition for that phrase.

Accordingly, the court construes "jaw portion extending at a[n] [predetermined] obtuse

angle from one end of the [elongated] base portion" as "jaw portion extending at an angle

---

purpose of the angle, or why the angle is there at all: to allow the jaw portion to face inwardly
and downwardly. Therefore, this language does not support utilizing the device mounting
surface to define the angle.

greater than 90 degrees and less than 180 degrees from one end of the base portion." The court declines to construe "jaw portion extending [from the base portion] at an angle between approximately 120 degrees and 150 degrees."

8. <u>clamp mounting surface being structured to cooperate with the mounting structure of the clamping mechanism for positioning the resilient compressible pad spaced away from and inclined toward the device mounting surface</u>

This term appears in Claims 21 and 27 of the Patent. (Patent at 9:45-49; 10:22-27.) The parties offer the following competing constructions:

**NPI's Proposed Construction:** "the clamp mounting surface being configured to allow positioning of the jaw portion and mounting structure on opposite sides of the base portion of the clamping mechanism such that the resilient compressible pad is spaced away from and inclined toward the device mounting surface." (NPI Op. Br. at 23.)

**Defendants' Proposed Construction:** "clamp mounting surface acts together with the mounting surface [of the clamping mechanism for positioning the resilient compressible pad spaced away from and inclined toward the device mounting surface]."[18] (Defs. Op. Br. at 19.)

The court construes this term to be "clamp mounting surface acts together with the mounting surface of the clamping mechanism or clamping member so that the resilient

_____

[18] At the *Markman* hearing, Defendants altered their proposed construction to include the portion in brackets, which indicates how the resilient compressible pad would be positioned in relation to the device mounting surface.

compressible pad of the jaw portion is spaced away from and inclined towards the device mounting surface." This definition tracks the modified version of Defendants' proposed construction.

NPI's proposed construction errs principally because NPI rehashes its attempt to define a "clamping mechanism" as the larger mounting platform as a whole, and thus construes the relevant "mounting structure" as the one found on the bottom of the frame members. (*See* NPI Op. Br. at 23-24.) As discussed at length above, *see supra* § III.B.3-4, there is limited support that the "clamping mechanism" is the larger mounting apparatus, and thus, limited support that the "mounting structure" in Term 8 is the structure located on the bottom of the frame members.

Moreover, there is no evidence that the clamping surface on the sides of the frame members "cooperates" in any fashion with the mounting structure on the bottom of the frame members. (*See generally* Patent.) NPI seems to argue that the two structures are "cooperat[ing]" simply by both being on the frame members in a certain configuration, even if they are not directly interacting with each other. (*See* NPI Op. Br. at 23-24.) This definition of "cooperate" belies the Patent language. The term "cooperate" in the Patent is used when describing how two high friction surface areas may interact to hold two structures in place. (*See* Patent at 5:45-52 ("that is configured to cooperate with the high friction surface area formed on the respective end faces"); *see also id.* at 10:46-47 ("cooperating anti-slippage structures").) "Cooperate" is also used to describe how "an optional T-shaped flange" can be joined with "a cooperating slot structure." (*Id.* at

//

6:18-20.) This usage of "cooperate" does not support NPI's contention that two structures may cooperate simply by both being a part of the same product.

Instead, the Patent makes clear that the relevant interaction is between the clamp mounting surface of the frame members and the base portion of the arm tool. For example, dependent Claim 28 details that "the clamping mechanism [is] mounted on each clamping mounting surface." (Patent at 10:35-36.) Dependent Claim 31 further notes that "the clamping mounting surface and the base portion of the clamping mechanism are formed with cooperating anti-slippage structures." (*Id.* at 10:45-47.) These claims would make little sense if the relevant mounting structure was on the bottom of the frame members. There is simply no evidence—and no physical way—that the bottom of the frame members could be attached to the clamp mounting surface located on the side of the frame members, or that the bottom and the side of the frame members have "anti-slippage structures" that interact with each other. Thus, the court rejects NPI's attempt to define "clamping mechanism" as the entire mounting apparatus in Term 8.

NPI takes issue with Defendants' use of the term "acts together," arguing that the clamp mounting surface and the mounting structure do not need to "*directly* cooperate with one another." (NPI Op. Br. at 24.) But read in light of the claim and specification language, the term "cooperate" does suggest such direct interaction. For instance, dependent Claims 31 and 32 note that the two structures are "formed with cooperating anti-slippage structures" that may be made up of "a grooved, a knurled, a diamond, a serrated, a slotted, and a roughened surface area." (Patent at 10:45-47, 10:50-52.) These claims suggest that the anti-slippage structures are used to directly attach one structure to

the other. The specification further notes that "[o]ne or more of the clamping

mechanisms are coupled to each of the first and second body portions." (*Id.* at 1:64-2:2.)

The term "coupled" implies that the two structures are not merely structured in relation to

each other, as NPI suggests. Moreover, the "Description of Preferred Embodiment"

states that the mounting surface on the base portion of the arm tool "is configured to

cooperate with the high friction surface area formed on the respective end faces [] to

eliminate slippage." (*Id.* at 5:45-47.) Again, slippage could not be eliminated through

the high friction surface area without some sort of direct connection between the clamp

mounting surface and the mounting structure.

Accordingly, the court construes "clamp mounting surface being structured to

cooperate with the mounting structure of the clamping mechanism for positioning the

resilient compressible pad spaced away from and inclined toward the device mounting

surface" to mean "clamp mounting surface acts together with the mounting surface of the

clamping mechanism or clamping member so that the resilient compressible pad of the

jaw portion is spaced away from and inclined towards the device mounting surface."

## IV.    CONCLUSION

For the foregoing reasons, the court rules as follows:

(1) the court CONSTRUES "slidably interconnected" to mean "connected, directly

    or indirectly, to each other to permit sliding relative to one another along one

    axis";

(2) the court DECLINES TO CONSTRUE "mechanically coupled";

//

1     (3) the court CONSTRUES "base portion [of the clamping mechanism]" to mean

2         "bottom part of a clamping member or a clamping mechanism";

3     (4) the court CONSTRUES "base portion [of the clamping member]" to mean

4         "bottom part of a clamping member or a clamping mechanism";

5     (5) the court CONSTRUES "jaw portion" to mean "gripping part of a clamping

6         member or a clamping mechanism that engages an accessory device";

7     (6) the court CONSTRUES "jaw portion extending at an obtuse angle from one

8         end of the base portion" AND "jaw portion extending at a predetermined

9         obtuse angle from one end of the elongated base portion" to mean "jaw portion

10        extending at an angle greater than 90 degrees and less than 180 degrees from

11        one end of the base portion";

12     (7) the court DECLINES TO CONSTRUE "jaw portion extending from the base

13        portion at an angle between approximately 120 degrees and 150 degrees" AND

14        "jaw portion . . . extending at an angle between approximately 120 degrees and

15        150 degrees"; and

16     (8) the court CONSTRUES "clamp mounting surface being structured to

17        cooperate with the mounting structure of the clamping mechanism for

18        positioning the resilient compressible pad spaced away from and inclined

19        toward the device mounting surface" to mean "clamp mounting surface acts

20        together with the mounting surface of the clamping mechanism or clamping

21        member so that the resilient compressible pad of the jaw portion is spaced

22        away from and inclined towards the device mounting surface."

Dated this 30th day of September, 2017.

JAMES L. ROBART
United States District Judge